[Nos. C034625, C035383. Third Dist. Dec. 17, 2002.]

MELANIE RIEGER, Plaintiff and Appellant, v.
CLAYEO C. ARNOLD et al., Defendants and Respondents.

CLAYEO C. ARNOLD et al., Plaintiffs and Respondents, v.
MELANIE RIEGER, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IX of the Discussion.

452

**COUNSEL**

Brayton-Purcell, Alan R. Brayton, Clayton W. Kent and James Geagan for Plaintiff and Appellant and Defendant and Appellant.

Rebecca L. Henry for Equal Rights Advocates, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant and Defendant and Appellant.

Mitchell & Ison, Leslie M. Mitchell; Law Offices of Anthony Poidmore and Anthony Poidmore for Plaintiffs and Respondents and Defendants and Respondents.

## OPINION

**DAVIS, Acting P. J.**—Plaintiff Melanie Rieger claimed to have been a victim of job discrimination in the form of a sexually harassing "hostile" work environment. (E.g., *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1146 [74 Cal.Rptr.2d 510] (*Weeks*).) She filed an action alleging this and other theories against the defendants Clayeo C. Arnold, his office manager (Susan Artenstein), and his professional law corporation. (*Rieger v. Arnold* (Super. Ct. Sacramento County, 1997, No. 97AS03390).) The defendant law firm and defendant Arnold filed an action against the plaintiff seeking, inter alia, damages and injunctive relief for misappropriation of trade secrets and interference with computer records. (*Arnold v. Rieger* (Super. Ct. Sacramento County, 1997, No. 97AS00985).) The parties tried these actions jointly to a jury. The court entered judgment in favor of the defendants. The plaintiff appeals from the judgment in case No. C034625, and from various postjudgment orders in case No. C035383.[1] We have consolidated the two appeals.

In the published portion of this opinion, we address the plaintiff's contention that the trial court erred in admitting evidence of her prior sexual conduct. This requires us to interpret the statute that excludes such evidence in a civil action for sexual harassment, sexual assault, or sexual battery, except for "the plaintiff's sexual conduct with the alleged *perpetrator*." (Evid. Code, § 1106, subd. (b), italics added.) We conclude the proper understanding of this exception includes both a named defendant and any other person for whom a plaintiff would hold a named defendant liable. We therefore find that the bulk of the evidence of the plaintiff's prior sexual conduct was admissible, and that the inadmissible evidence would not have affected the outcome. We reject the rest of her claims in the unpublished portion of the opinion. We shall therefore affirm.

### FACTS

The plaintiff does not include the required summary of material facts in her brief. (Cal. Rules of Court, rule 14(a)(2)(C).) While this dereliction warrants our disregard of any contentions involving a question of fact (*Margott v. Gem Properties, Inc.* (1973) 34 Cal.App.3d 849, 853 [111 Cal.Rptr. 1]), we shall exercise our discretion to entertain her appeal (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1182, fn. 1 [49 Cal.Rptr.2d 220]), as the defendants have adequately remedied the omission. We relate here an overview of pertinent facts adduced at trial, resolving all disputes in favor of the judgment. (*Kuhn v. Department of General Services*

---

[1] Equal Rights Advocates, Inc., filed an amicus curiae brief in support of the plaintiff.

(1994) 22 Cal.App.4th 1627, 1632-1633 [29 Cal.Rptr.2d 191].) We will incorporate additional facts in the Discussion where pertinent.

The plaintiff first worked for defendant Arnold at the defendant law firm in the mid-1970's, during which time she had occasionally dated defendant Arnold. There were a number of family ties between them, as defendant Arnold eventually married the sister of the plaintiff and defendant Arnold's sister married a brother of the plaintiff. The plaintiff left her job with the defendant law firm around 1980, occasionally returning for brief interludes of employment.

In June 1993, the plaintiff came back to the defendant law firm full-time as a legal secretary. Defendant Artenstein was now the office manager. The two became close friends.

In response to an employee's complaint that defendant Arnold sexually harassed her, the defendant law firm instituted a policy in November 1996 that prohibited any touching, as well as talking and joking about sexual topics. At the meeting announcing the new policy, the plaintiff objected, asserting her belief that they were all adults who were capable of asserting objections to unwelcome conduct. She also said that she did not believe the claim of harassment, because she had known defendant Arnold for over 20 years and had never known him to behave inappropriately.

The defendant law firm had been undergoing financial problems, which led defendant Arnold to institute a number of other policy changes at the same time. These included prohibitions against the personal use of computers or telephones, and prior approval for any overtime.

In early December 1996, defendant Arnold called a store from the plaintiff's office to order a tuxedo for his wife as a present. He asked the plaintiff to assist him with the order. He was not sure whether his wife wore a size 8 or 10 in pants. The plaintiff extended her arms, asserting that she wore a size 10 but his wife had been exercising. Defendant Arnold put his hands on the plaintiff's hips and then replied that he thought his wife was a size 8.

The defendant firm's financial situation continued to worsen. A couple of weeks later, defendant Artenstein told the plaintiff that there would be not be any Christmas bonuses that year. This upset the plaintiff because she was counting on the money to buy gifts. Later that same day, the plaintiff told defendant Artenstein that defendant Arnold had violated the no-touching policy. Defendant Artenstein asked the plaintiff to put her concerns in a memo.

In her memo, the plaintiff stated that she was happy to help defendant Arnold order the tuxedo but was startled when he "suddenly placed [his] hands on [her] body to discern the difference in our physics [*sic*] in order to arrive at the appropriate suit size." She continued, "I realize that because we are related by marriage and have been friends for 20 years, the touching was probably just an impulse, yet it was uncomfortable for me." Because "you have discussed a 'no touching' policy in two separate meetings, and because this was uncomfortable for me I discussed my discomfort with Sue [Artenstein]. . . . I enjoy my job here very much and just want [to] affirm that I expect the same professional treatment that [is] afforded the others here. I am always happy to help you with projects for your family." She concluded, "Thank you for your consideration. With this memo, the incident is forgotten and I do not wish to discuss it further."

Defendant Arnold received the memo a couple of days later. He was upset, because the prior complaint of harassment had caused considerable strain on his marriage. Defendant Arnold and the plaintiff met in a conference room. He sat at the end of the conference table; the plaintiff sat on the side, turned diagonally to face him. Defendant Arnold became angry, raised his voice, and used profanity, asking why the plaintiff had made this complaint. She retorted, "You violated the no touching rule. I'm going to make it stand." He threw his glasses from one end of the conference table to the other.

In January 1997, defendant Arnold decided to take further remedial financial measures. He announced he would lay off one employee and cut the pay of remaining employees by 10 percent (except for the lowest paid employee). The plaintiff claimed she did not have to take a pay cut because she had an employment contract. Defendant Arnold disagreed. After further argument between them, the plaintiff refused to accept the pay cut and defendant Arnold dismissed her on February 4, 1997. The other employees received the proposed salary reductions.

Soon thereafter, an employee discovered that someone had deleted frequently used forms from the computer records. The defendant firm hired a computer expert to retrieve the files. The expert determined that someone had deleted more than 200 files on the day of the plaintiff's dismissal. The plaintiff later admitted to copying the files (although she denied deleting any). She returned two disks containing forms and other work product.

In March 1997, the plaintiff filed a complaint with the Department of Fair Employment and Housing (DFEH). She alleged, "Mr. Arnold demanded I take a cut in pay and when I refused, he fired me. I believe I was fired in

retaliation for spurned sexual advances made by Clayeo C. Arnold of which I complained of [sic] to Clayeo C. Arnold and Susan Artenstein, the office manager." Almost three months later, she filed an additional DFEH complaint in which she alleged "Susan Artenstein repeatedly engaged in harassing me, including making sexual comments, jokes, inferences, sexual innuendoes and derogatory remarks to me, despite my requests that she cease making such sexual comments and remarks."

The plaintiff brought the present action in July 1997. By the time of trial, her remaining causes of action were for job discrimination under the Fair Employment and Housing Act (FEHA),[2] wrongful termination, assault, and battery. The trial court prepared a special verdict form for the jury, with the assent of counsel. According to its findings in the verdict, the jury did not believe the plaintiff had experienced sexual harassment in the form of a hostile work environment. However, it believed that the defendant law firm and defendant Artenstein had not taken sufficient steps to protect her from sexual harassment, and awarded $15,000 in damages solely against the defendant law firm. (It absolved defendant Arnold of any failure to protect her.) The jury also found that the defendant law firm did not wrongfully terminate the plaintiff, and that defendant Arnold neither assaulted nor battered her. Finally, the jury found the plaintiff had interfered with the computer records, awarding $237.50 to the defendant law firm in damages.

The trial court entered judgment notwithstanding the verdict as to the jury's finding that the defendant law firm and defendant Artenstein did not take sufficient steps to protect the plaintiff from harassment, and as to the award of damages. In all other respects, the court entered judgment conforming to the verdicts in the defendants' favor. The court thereafter denied the plaintiff's motion for judgment notwithstanding the verdict, granted the defendants' motions to amend the judgment, and granted the defendants' motion for reimbursement of their costs and legal fees.

## DISCUSSION

## I

The parties debated the admissibility of evidence of the plaintiff's prior sexual conduct. The trial court ultimately ruled that it would admit evidence of her sexual conduct that either occurred in the workplace, or with other members of the workforce whether or not in the workplace.

---

[2]Government Code section 12900 et seq.

■ The plaintiff asserts most of this evidence should have been excluded pursuant to Evidence Code section 1106.[3] After first determining the relevant criteria, we will then catalogue the abundant testimony on the issue to determine if the trial court prejudicially erred in admitting it.

## A

■ The FEHA prohibits the sexual harassment of an employee. (Gov. Code, § 12940, subd. (j)(1).) Sexual harassment consists of any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 607 [262 Cal.Rptr. 842] (*Fisher*).) It usually arises in two contexts. "Quid pro quo" harassment conditions an employee's continued enjoyment of job benefits on submission to the harassment. "Hostile work environment" harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace. (*Weeks, supra,* 63 Cal.App.4th at p. 1146.)

Actionable sexual harassment must be sufficiently severe or pervasive to the point of creating an abusive environment that alters job conditions (*Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 67 [106 S.Ct. 2399, 2405-2406, 91 L.Ed.2d 49] (*Meritor Savings*),[4] judged on both an objective and subjective basis. (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21-22 [114 S.Ct. 367, 370-371, 126 L.Ed.2d 295] (*Harris*); accord, *Aguilar, supra,* 21 Cal.4th at pp. 130-131.) This requires evaluation "of the social context in which particular behavior occurs and is experienced by its target . . . . [It] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81-82 [118 S.Ct. 998, 1003, 140 L.Ed.2d 201] (*Oncale*).)

## B

Enacted in 1985, section 1106 provides: "In any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, opinion evidence, reputation evidence, and evidence of specific instances of plaintiff's sexual conduct, or any of such evidence, is not admissible by the defendant in order to prove consent by the plaintiff or the

---

[3]Subsequent undesignated section references are to the Evidence Code.

[4]It is proper to apply federal precedent under title VII of the federal Civil Rights Act of 1964 to claims under the FEHA (see 42 U.S.C. § 2000e et seq.). (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129-130 [87 Cal.Rptr.2d 132, 980 P.2d 846] (*Aguilar*).)

absence of injury to the plaintiff, unless the injury alleged by the plaintiff is in the nature of loss of consortium." (*Id.*, subd. (a).) As we highlighted at the outset, it has an exception for the admission of evidence of "the plaintiff's sexual conduct with the alleged perpetrator." (*Id.*, subd. (b).) It does not apply to evidence offered under section 783 for impeachment. (§ 1106, subd. (d).)[5]

The Legislature declared its intent in enacting section 1106 as follows: "[I]t is the existing policy of the State of California to ensure that the causes of action for . . . sexual harassment, sexual assault, or sexual battery are given proper meaning. The discovery of sexual aspects of complainant's [*sic*] lives, as well as those of their past and current friends and acquaintances, has the clear potential to discourage complaints and to annoy and harass litigants [which] is unnecessary and deplorable. Without protection . . . , individuals whose intimate lives are unjustifiably and offensively intruded upon might face the . . . risk of enduring further intrusions into details of their personal lives in discovery, and in open quasi-judicial or judicial proceedings. [¶] . . . [A] similar state of affairs once confronted victims in criminal prosecutions for rape . . . . The Legislature has taken measures to curb those abuses in rape proceedings. It is the intent of the Legislature to take similar measures in sexual harassment, sexual assault, or sexual battery cases. [¶] The Legislature concludes that the use of evidence of a complainant's sexual behavior is more often harassing and intimidating than genuinely probative, and the potential for prejudice outweighs whatever probative value that evidence may have. Absent extraordinary circumstances, inquiry into those areas should not be permitted, either in discovery or at trial." (Stats. 1985, ch. 1328, § 1, pp. 4654-4655.)

 In applying section 1106, we must determine whether the evidence proved consent or absence of injury, was within the meaning of "sexual conduct," and involved a "perpetrator" in an action alleging a hostile work environment. We consider each of these questions in turn.

## C

### 1. *Consent or Absence of Injury*

As we noted, proof of a hostile job environment includes the element of the employee's subjective perception of it as abusive or unwelcome. (*Harris,*

---

[5]The Legislature enacted section 783 contemporaneously with section 1106. It also applies "[i]n any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, if evidence of sexual conduct of the plaintiff is offered to attack credibility of the plaintiff." It prescribes a procedure that includes a noticed written motion (§ 783, subd. (a)), the affidavit of counsel reciting an offer of proof (*id.*, subd. (b)), and a foundational hearing to question the plaintiff regarding the offer of proof (*id.*, subd. (c)); after the court applies section 352, it then must "make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted" (§ 783, subd. (d)).

*supra*, 510 U.S. at pp. 21-22 [114 S.Ct. at pp. 370-371]; *Fisher, supra*, 214 Cal.App.3d at p. 607.) In contending this element has not been proven, a defendant will assert that a plaintiff consented to the conduct through active participation in it, or was not injured because the plaintiff did not subjectively find it abusive. Under the terms of section 1106, a plaintiff's prior sexual conduct cannot be admitted to rebut claims that the environment was abusive or unwelcome, *except* if it involved a perpetrator. We must filter the evidence in the present case accordingly.

Amicus curiae argues that we should interpret section 1106 as entirely eliminating the consideration of this element from the cause of action, because otherwise the focus of the trial would shift from the actions of the defendant to the actions of the plaintiff. In the first place, this argument was not among the issues that the parties raised. ■ We may disregard an amicus curiae's attempts to expand the issues on appeal. (*Eggert v. Pacific States S. & L. Co.* (1943) 57 Cal.App.2d 239, 251 [136 P.2d 822].) ■ More to the point, amicus curiae's efforts to derive a legislative intent to exclude *all* inquiry into a plaintiff's prior sexual conduct runs afoul of the express statutory language allowing inquiry into prior sexual conduct with a perpetrator. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 176, fn. 9 [96 Cal.Rptr.2d 518, 999 P.2d 706] [cannot derive a statute's purpose that ignores express language].)

### 2. *Sexual Conduct*

Relying on a precedent in criminal law construing a statute similar to section 1106, the defendants urge a narrow definition of sexual conduct. They argue that sexually *related* statements or conduct are not within the meaning of the statute. The plaintiff, by contrast, asserts we must construe section 1106 broadly.

We write on a blank slate in construing section 1106's use of the term "sexual conduct." However, *People v. Casas* (1986) 181 Cal.App.3d 889 [226 Cal.Rptr. 285] (*Casas*) interpreted the term as used in sections 782 and 1103 (which both govern the admissibility of a victim's past sexual conduct in criminal prosecutions for sexual offenses). Rejecting a narrow construction, *Casas* concluded the exclusion should extend beyond sexual activity itself to conduct that reflects a willingness to engage in sexual activity; as a result, *Casas* excluded evidence that the rape victim offered to have sexual intercourse with another man for money. (*Casas*, at p. 895; see *People v. Franklin* (1994) 25 Cal.App.4th 328, 334-335 [30 Cal.Rptr.2d 376] [citing *Casas*].) In light of the uncodified declaration of legislative intent to

extend the same protections to parties in civil cases, we should impart a similarly broad construction.[6]

The defendants concede, as they must, that sexual activity itself and direct statements of a plaintiff's willingness to engage in sexual activity are within the ambit of the statute. They would exclude, however, statements or actions that are sexual in nature but reflect a willingness to engage in sexual activity only inferentially (e.g., ribald horseplay or humor).

The Evidence Code's definition of "conduct" includes "*all* active and passive behavior, both verbal and nonverbal." (§ 125, italics added.) There is no basis for interpreting "conduct" more narrowly in section 1106. Given the far-reaching intent of the Legislature to limit intrusion into a plaintiff's privacy with regard to sexual matters, there is no reason to interpret "sexual" in any manner other than its plain meaning of that which relates to the broad spectrum of erotic activity. We therefore conclude that "sexual conduct" includes all active or passive behavior (whether statements or actions), that either directly or through reasonable inference establishes a plaintiff's willingness to engage in sexual activity.

 Consequently, testimony about the plaintiff's racy banter, sexual horseplay, and statements concerning prior, proposed, or planned sexual exploits were all "sexual conduct" under section 1106 and subject to exclusion. We therefore must now determine if any of this testimony is admissible as sexual conduct with a perpetrator. (§ 1106, subd. (b).)

3. *Perpetrator*

During discussions between the court and counsel concerning the proper interpretation and application of section 1106, the court opined that in a case alleging a hostile work environment, the perpetrator for the purpose of applying section 1106 is the workplace itself. Based on this understanding, the trial court admitted some of the defendants' evidence concerning the prior sexual conduct of the plaintiff.

---

[6]To the extent precedent from other states has relevance to an indigenous public policy, Maryland had a statute that prohibited the admission of evidence of a victim's prior sexual conduct except with the defendant or to prove motive, to impeach, or to demonstrate the source or origin of semen, pregnancy, disease, or trauma. (See *Shand v. State* (1996) 341 Md. 661, 664, fn. 2 [672 A.2d 630, 631] (*Shand*).) To construe the statute's use of the term "sexual conduct," the Maryland Court of Appeals canvassed decisions in other states (including *Casas*), concluding that the victim's offer to trade sex for drugs is sexual conduct and therefore must be excluded. (*Shand, supra,* 672 A.2d at pp. 638-639.) The court observed that "we do no violence to the legislative intent, as manifested by the legislative history, when we construe 'sexual conduct' to embrace a wider range of activity than 'physical contact.' " (*Id.* at p. 638.)

The plaintiff challenges this ruling. Rather than present reasoned arguments concerning the definition of perpetrator for a case alleging a hostile work environment, she simply asserts that the ruling "served to entirely eviscerate the clear language and intent of Section 1106," "ignored the clear language of . . . Section 1106," "fl[ew] directly in the face of Section 1106," and was "clearly prejudicial error." The argument of amicus curiae suffers a similar defect. It asserts perpetrator "refers to the defendant, a live animate being, just as the offending party in the criminal rape context is the defendant," but amicus curiae offers no authority other than its belief in a legislative intent to shift the focus from a plaintiff's conduct to the defendant's, which as we previously stated fails to take into consideration the express exception for a plaintiff's conduct with a perpetrator. Amicus curiae further argues that the trial court's construction of the statute would render the Evidence Code "useless" in claims of a hostile work environment. This hyperbole does not substitute for probative evidence of statutory intent. (Cf. *Degrassi v. Cook* (2002) 29 Cal.4th 333, 340 [127 Cal.Rptr.2d 508, 58 P.3d 360] [criticizing argument lacking support in history of provision of constitution].)

██ As the statutory context of "perpetrator" is ambiguous, it is proper for us to grant the plaintiff's request to take judicial notice of the legislative history associated with section 1106. (*Estate of Griswold* (2001) 25 Cal.4th 904, 911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].)

██ There is no express contemplation in these materials of the application of section 1106 to a case alleging a hostile work environment. However, 1980 federal guidelines that approved the concept of cases alleging a hostile work environment arose out of a "substantial" body of federal law dating back to 1971, and subsequently met with "uniform" judicial approval by 1985. (*Meritor Savings, supra*, 477 U.S. at pp. 65-67 [106 S.Ct. at pp. 2404-2406].) It would be contrary to basic interpretive tenets to presume the Legislature was unaware of this well-established doctrine when it enacted section 1106 in 1985. (*In re Marriage of Plescia* (1997) 59 Cal.App.4th 252, 261 [69 Cal.Rptr.2d 120].)

In accord with the uncodified declaration of legislative purpose, the legislative history shows an intent to pattern section 1106 after section 1103. (E.g., Assem. Judiciary Com., 3d reading analysis of Sen. Bill No. 1057 (1995-1996 Reg. Sess.) as amended Aug. 28, 1985, p. 2, com. 2 (3d reading analysis).) This exception in section 1106 for conduct with a perpetrator tracks the exception in section 1103, except that "defendant" in the latter became "perpetrator" in the former. There is, however, no specific reason for the change in terminology—instead, the focus is on the *irrelevance* of sexual

conduct with anyone *else*, taking it as a given that such conduct with the perpetrator is admissible. (3d reading analysis, *supra*, p. 2.) It is rational to infer the Legislature, by contrast, found conduct with a perpetrator to be relevant for the purpose of basic due process to an accused, allowing the introduction of evidence of consent. Otherwise, charges of harassment would be "self-proving." (Cf. *People v. Keith* (1981) 118 Cal.App.3d 973, 983 [173 Cal.Rptr. 704].) This exception is in harmony with the purpose of the statute. While evidence of a plaintiff's prior sexual conduct is generally more "harassing and intimidating than genuinely probative" (Stats. 1985, ch. 1328, § 1, p. 4655), the exception is a legislative recognition that evidence of prior sexual conduct with the perpetrator *is* genuinely probative.

We cannot accept the suggestion that we should interpret the use of perpetrator in section 1106 as nothing more than a synonym for defendant. ▇ Where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, we must presume that it intended a different meaning. (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348].)

▇ We can readily intuit the principle behind the change in terminology. Though a case alleging a hostile work environment conceivably can name individuals as defendants, generally such actions name only the deeper-pocketed employing entity (or, as here, the employer and individual defendants). ▇ Under the FEHA, an employing entity can not only be directly liable for sexual harassment, but indirectly liable as well for the actions of its agents and supervisors or for the actions of its nonsupervisory employees if it was or should have been aware of them and did not take remedial measures. (*Fisher, supra*, 214 Cal.App.3d at p. 608, fn. 6; Gov. Code, § 12940, subd.(j)(1), (4)(A).) ▇ An employing entity must also take reasonable steps to prevent harassment from occurring. (Gov. Code, § 12940, subd. (k).) As a result, there could be far more actors in the harassment drama for whom a plaintiff would hold the employing entity responsible than are named as defendants. Consistent with the legislative intention to allow a defense based on genuinely probative evidence, we conclude perpetrators include not only the named defendants but also any other actor whose conduct the plaintiff seeks to ascribe to the employing entity. The employing entity would otherwise be hamstrung with imputed liability against which it could not effectively defend.

▇ The trial court's designation of the inchoate "workplace" as a perpetrator was both too narrow and too broad. There is no logical reason to exclude a plaintiff's sexual conduct with a named defendant (or harassing actor) *outside* the workplace. Conversely, admitting *all* evidence of a plaintiff's sexual conduct in the workplace is unwarranted except where it occurs

with those whom a plaintiff alleged as perpetrating the hostile environment. A plaintiff might feel comfortable engaging in ribald horseplay and humor or exchanging embraces with some people, yet find such familiarity from others to be odious. If a supervisor foists unwanted sexual attention on a plaintiff, this should not make stolen kisses with a coworking *inamorata* in the break room any more fair game for discovery than evidence of wild *alfresco* romps with a partner entirely unconnected with the workplace. It would not further the legislative intent to protect a plaintiff's privacy if we were to allow inquiry into a plaintiff's conduct with anyone other than those about whom the plaintiff complained, merely because they are coworkers. The exception would otherwise swallow the rule of general exclusion.

Conceivably, a plaintiff's claim of a failure to protect from a hostile work environment might make *any* coworker who allegedly contributed to the environment a perpetrator (which might be the concept that the superior court was trying to articulate). As we noted above, however, a finding of an offensive job environment is context specific. (*Oncale, supra,* 523 U.S. at pp. 81-82 [118 S.Ct. at pp. 1002-1003].) In the present context, the plaintiff has never contended in either her FEHA complaints or in her judicial pleadings that there was a failure to protect her from anyone's conduct other than the individual named defendants. Moreover, since we do not find prejudicial error even under this limited interpretation of perpetrator in the present case, it would be idle academic rumination to determine the extent that other agents or employees of the defendant law firm come within the section 1106 exception.

We thus will consider admissible only evidence about the plaintiff's prior sexual conduct with the individual defendants, or others whose conduct the plaintiff ascribed to the employer, regardless of whether it occurred in or outside the workplace. Using this more discerning filter, we must now rescreen the corpus of evidence that the trial court admitted. We will omit overlap where the same evidence would be admissible through more than one witness, or through one witness but not another (e.g., where defendant Artenstein and her husband both testified about the same events). We will address all of the evidence complained of in the plaintiff's briefing. We will, however, omit the individual defendants' testimony about other specific instances of the plaintiff's sexual conduct with them, as it is simply additional admissible evidence that cannot aid the plaintiff's claim of prejudicial error. We will not attempt to bring a narrative fluidity to these disjointed facts.

D

1. *Admissible Evidence*

Defendant Artenstein and the plaintiff freely talked with each other about intimate sexual matters and their relationships (sometimes with defendant Artenstein's husband present), and defendant Artenstein often observed the plaintiff share intimate sexual details with other friends in the office. Specific examples of subjects of the plaintiff's conversations during office meetings when defendant Artenstein was among those present included: her description of her partner's penis as unusually thick; her description of the anatomy and sexual proficiency of one of her dates (an expert witness whom the defendant law firm often used); her claim that she and her partner had used the conference room table to have sexual relations; her description of dancing in a bar on a table after taking off her blouse; her making public that the one and only sexual partner of the defendant law firm's receptionist was the latter's husband; and her concern about having AIDS after a sexual encounter with a friend of the Artensteins at their house (on which occasion she had walked naked or nearly naked into the Artenstein bedroom to ask for a condom), after learning that he had dated a stripper. With defendant Artenstein present, the plaintiff made sexual comments about the way Mr. Artenstein's crotch looked when he was wearing bicycle shorts. An associate of the defendant law firm recalled that at a potluck at her house (at which defendant Artenstein was present), the plaintiff told a story about running naked with defendant Arnold through an apartment complex (after being in a hot tub) when they were dating.

There was also testimony about specific instances of sexually related actions. A number of witnesses were aware that the plaintiff waxed her pubic hair into the shape of a heart to please her partner; she had also taken defendant Artenstein into the bathroom to show her. The plaintiff and defendant Artenstein put a condom over defendant Arnold's phone. The plaintiff displayed her bra and underwear at a staff meeting at which defendant Artenstein was present. A former associate of the firm testified that the plaintiff, in the presence of defendant Artenstein and others, waved a cucumber at him and said that they would not need him anymore. The plaintiff asked defendant Artenstein's husband to repeat a joke for the benefit of defendant Arnold, the punch line for which involved fondling her breasts. A number of witnesses observed the plaintiff and defendant Artenstein rub each other's backs, touch each other's breasts, and pinch each other's rear ends. At a "bachelorette party" for defendant Artenstein, the plaintiff danced with a stripper whom she had hired. Finally, in the presence of defendant Artenstein, the plaintiff asked the defendant law firm's investigator if he would give her a copy of an adult video.

### 2. *Inadmissible Evidence*

Various witnesses testified (some at firsthand) that the plaintiff pinched the rear ends of a number of men. A computer consultant testified that the plaintiff unbuttoned his shirt and stuck her hand inside, saying that his chest was a woman's dream. The defendant law firm's former paralegal described the plaintiff as flirtatious around men. On one occasion, the plaintiff grabbed the receptionist's breasts and said they should be lesbians; on another, she asked the receptionist to imitate the sounds the latter's husband made during their sexual relations. According to the investigator, the plaintiff talked to him about an out-of-town trip on which she had shared a bed with a female coworker, who awoke to find the plaintiff masturbating (apparently because the sounds of sexual activity in the next room had aroused her). Witnesses testified that the plaintiff offered to have a "one-night stand" with one of the firm's attorneys who was soon to be married. A former associate testified that the plaintiff often spoke with him about sexual matters, including her sexual relations with her partner. Another associate testified that the plaintiff asked if he wanted to watch the adult videos that she had obtained from the investigator, and often talked with him about the intimate aspects of their sexual activities with their partners; she also told him that she thought the receptionist had large breasts. Yet another associate testified that the plaintiff often talked and joked about sex, and made comments about desiring to have sexual relations with various men. The investigator testified that the plaintiff talked to him about her sexual encounters. The former paralegal (who was unsure who else was present) recalled that the plaintiff once expressed her willingness to orally copulate the next attorney who settled a case, and often suggested that the paralegal was a sexually frustrated person who needed "a good lay" to relax her.

### 3. *Prejudice Analysis*

As can be seen in the above summary, there was adequate admissible evidence to prove that the plaintiff did not find her job environment to be hostile. This is not a case where there were only isolated admissible instances, such that the body of inadmissible evidence gave a false impression on the issue. Nor was the tenor of the inadmissible evidence more egregious than that of evidence properly before the jury. The inadmissible evidence in the present case was no more than an exercise in painting the lily.[7] We thus conclude it is not reasonably probable that the plaintiff would have had a

---

[7]Shakespeare, King John, act IV, scene 2, line 11.

more favorable result in its absence.[8] (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].)

II-IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment and the postjudgment orders are affirmed. The defendants' request for recovery of appellate legal fees is denied. The defendants shall recover their costs on appeal

Hull, J., concurred.

NICHOLSON, J.—I concur in the result. I also concur in the majority opinion except for the part defining the term "perpetrator" as found in Evidence Code section 1106, subdivision (b). Because, in my view, the majority defines the term too narrowly, I write separately.

The Legislature did not have hostile work environment harassment cases in mind when it enacted Evidence Code section 1106 and made the exception for conduct with a "perpetrator." The statute fails to address, directly, whether the plaintiff's sexual conduct is admissible on the issue of welcomeness and it gives no indication of what a "perpetrator" is when the plaintiff sues a corporate defendant or any other kind of employer, alleging harassment in the workplace. Review of the legislative history of section 1106 only reinforces the conclusion that the Legislature did not intend for section 1106 to apply to hostile work environment harassment cases, most likely because the subject never came up. Nonetheless, section 1106 includes the broad term "sexual harassment." Therefore, I presume the Legislature would have us attempt to apply the public policy behind the statute, even if the face of the statute and its history reveal a legislative gap. Hence, I endeavor to apply the statute the way it appears the Legislature would have applied the statute had it considered hostile work environment sexual harassment cases.

Essential to a hostile environment harassment cause of action is that "the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create *an abusive working environment* . . . ." (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842], italics added.) "Whether the . . . conduct complained of is sufficiently pervasive to create *a hostile or offensive work*

---

[8]Because we conclude that there was no prejudicial error in admitting evidence pursuant to section 1106, we need not address whether it could have been properly admitted pursuant to section 783 as impeachment evidence.

*See footnote, *ante*, page 451.

*environment* must be determined from the totality of the circumstances." (*Id.* at p. 609, italics added.) Thus, the trier of fact must determine whether the work environment is hostile or abusive, which may not be so if the plaintiff welcomed the conduct. The plaintiff's conduct within the work environment, particularly the plaintiff's sexual conduct, is genuinely probative of whether the plaintiff suffered injury because of the environment. Whether the plaintiff condoned, caused, or willingly participated in sexual conduct in the work environment is genuinely probative of whether the plaintiff suffered injury from the sexual conduct of others.

Consistent with the intent of the Legislature that the defendant in a sexual harassment case must be able to present a defense based on genuinely probative evidence, as noted by the majority, I conclude that a corporate defendant, acting through its employees, is the "perpetrator" for the purpose of applying Evidence Code section 1106. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 656 [76 Cal.Rptr.2d 499, 957 P.2d 1333] ["corporation can act only through its individual employees"].) When a plaintiff accuses a corporate defendant of hostile work environment sexual harassment, the plaintiff necessarily alleges, either explicitly or implicitly, that the corporate defendant's employees created a hostile work environment. Therefore, sexual conduct with corporate employees is sexual conduct with the "perpetrator."

I would not limit the definition of "perpetrator," as does the majority, to employees against whom the plaintiff has made allegations of harassing behavior. The majority's anecdotes of stolen kisses in break rooms notwithstanding, its definition of "perpetrator" allows a plaintiff to limit genuinely probative evidence of welcomeness simply by carefully choosing the people against whom to make allegations of harassment. In that way, the plaintiff may mask genuinely probative evidence of conduct that took place on the employer's premises and the employer's time, while arguing entitlement to the employer's money. That result runs contrary to the Legislature's intent to accord due process to the accused by allowing evidence of welcomeness.

Finally, while I do not agree with the majority concerning the precise definition of "perpetrator," I concur that, whatever the definition, the plaintiff was not prejudiced by the admission of her sexual conduct in this case. I therefore concur in the judgment.

Appellant's petition for review by the Supreme Court was denied March 19, 2003. Kennard, J., was of the opinion that the petition should be granted.